**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **AMBER SMITH** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:16-CV-1107-KOB** |
| | ) | |
| **METRO MECHANICAL, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This matter is before the court on Defendant Metro Heating and Cooling, Inc.'s "Motion for Partial Summary Judgment." (Doc. 25). Plaintiff Amber Smith sued Metro, alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42. U.S.C. Section 2000e *et seq.*; retaliation in violation of the Fair Labor Standards Act; and denial of overtime pay in violation of the Fair Labor Standards Act. (Doc. 1 at 5–7). Metro moves for summary judgment on Smith's gender discrimination and retaliation claims, and partial summary judgment for unpaid wages under the FLSA. As explained more fully below, the court **GRANTS** the motion as to Amber Smith's gender discrimination and retaliation claims, but **DENIES** in part the motion regarding Amber Smith's unpaid overtime claim.

## I.      BACKGROUND

Defendant Metro Heating and Cooling employs service technicians to provide maintenance, diagnostics, and repair of heating and cooling systems to its customers. Plaintiff Amber Smith was the first female to apply to be a service technician at Metro's Pelham, Alabama location, and Roy Smith, Metro's General Operations Manager, hired her for that position on July 9, 2015.

During her application process, Amber Smith told Roy Smith that she gained extensive HVAC experience while working for her husband's HVAC business and misrepresented that she had received an associate's degree in heating, ventilation, and air conditioning from Bevill State. She also misrepresented to Roy Smith that she had graduated at the top of her class. (Doc. 26-1 at 30).

As is typical with new Metro service technicians, Amber Smith spent the first two weeks of her employment riding with other service technicians for on-the-job training. With the exception of her first day, Amber Smith rode exclusively with Kevin Concord. After two weeks, Mr. Concord told Roy Smith that Amber Smith was ready to begin handling service calls on her own. Aside from the ride-along training, Metro also provides new service technicians with a 90-day probationary period, during which they are given more leniency "to get with the program." (Doc. 26-1 at 19).

Metro pays its technicians for time spent while driving between job sites, visiting the shop for supplies or training, waiting on customers to arrive, and performing actual work on heating or cooling units, but not for down time between job assignments or lunch breaks. During down time, Metro expects its technicians to be as "available as possible," meaning they should be "immediately" ready if needed for a job. (Doc. 26-1 at 16). The technicians keep track of their compensable time on time sheets, and then submit those time sheets to Michelle Wynn, Metro's office manager. Ms. Wynn handles payroll and decides the number of compensable hours for each service technician. The service technicians' work vehicles contain GPS devices, which Ms. Wynn depends on to confirm the technicians' purported departure and arrival times during each workday.

**Incident #1:**

On July 23, 2015, Amber Smith went to a customer's home to service a residential HVAC unit. After investigating the unit, Amber Smith determined the customer's breaker box had blown a fuse, and went to Home Depot to purchase a replacement. However, because it was raining heavily, she was soaking wet when she returned to the customer's home. Fearful to change the breaker while drenched in water, Amber Smith called Roy Smith and informed him of her predicament. So, Roy Smith went to the customer's house and changed the fuse for Amber Smith.

**Incident #2**

Eight days later, on July 31, 2015, Amber Smith traveled to a customer's house where she determined that a compressor on a new air conditioning unit was malfunctioning. Unable to reach Roy Smith on the phone, Amber Smith called her husband for advice. After speaking with her husband, Amber Smith concluded the customer needed a new compressor. She notified Roy Smith, who told her that he would order one. Roy Smith then received a complaint from the customer, and was concerned that Amber Smith did not adequately explain her rationale for deciding that the compressor was broken. Therefore, he sent another technician to inspect the unit. That technician discovered the compressor was not broken, but that a clogged water pump was causing it to malfunction. The technician unclogged the pump, which solved the problem.

**Incident #3**

Four days later, on August 4, 2015, Metro sent Amber Smith to service a leaking unit in a customer's attic. Because the attic had no floor, Amber Smith asked the customer, Ms. Hutto, for permission to place some plywood on the beams so she could safely walk across them without falling through the ceiling. Ms. Hutto agreed and Amber Smith went to retrieve the plywood

from her van, which Metro kept for that purpose. However, before Amber Smith could reenter the home, the customer told Amber Smith "that she didn't feel comfortable with that and that she would rather – that there [were] men that had been coming in there, and they could do it." (Doc. 26-2 at 15). She also said "that she would rather have a man come out," and that "she would just feel more comfortable with a man coming out there." (*Id.*).

Amber Smith alleges that she then called Roy Smith, relayed to him Ms. Hutto's preference for a man to perform the work, and explained to him that she disagreed with the customer's preference. Roy Smith responded that "the customers are always right." (*Id.*). Amber Smith also alleges that Roy Smith became angry and raised his voice at her during that conversation, telling her that she was "not supposed to let the customers know when something is wrong or something like that." (Doc. 26-2 at 15). Amber Smith testified that she understood Roy Smith's frustration to be directed toward her mentioning "something to the customer about putting the plywood" in the attic. (*Id.* at 15–16).

Roy Smith testified that Amber Smith told him she did not feel comfortable walking across the ceiling joists in the attic, but did not tell him that the customer did not want a woman to do the job. (Doc. 26-1 at 31–32). He also testified that, after the incident with Amber Smith, Ms. Hutto would not allow any Metro technicians back into her home. (Doc. 26-1 at 31, 33).

Roy Smith also alleges that he received reports from other Metro employees that Plaintiff was "struggling with diagnosing equipment" and uncomfortable using refrigerant gauges and checking electrical components. (Doc. 26-1 at 41). To address the concerns, Roy Smith organized a training module to refresh all service technicians on these issues. (*Id.*). However, Roy Smith testified that Amber Smith was "reluctant to get involved" with the module, was "standing about forty [feet] away from [him] by the back door smoking," and "would not get

involved with things that she was having struggles with," like "put[ting] gauges on and set[ting] up equipment." (*Id.*). Amber Smith admitted in her deposition that she still "get[s] a little confused on the superheat and subcooling," but testified that she was listening and "trying to learn about the superheat and subcooling and everything" during the training module. (Doc. 26-2 at 16).

### Plaintiff's Termination

Metro terminated Amber Smith's employment on August 17, 2015, for "failure to meet performance expectations." (Doc. 26-2 at 64). Roy Smith was the sole decision-maker regarding her termination, and he told her that he was worried about her safety, felt that she did not know what she was doing, and that he had to let her go. (Doc. 26-2 at 18). Roy Smith testified that he went over with Amber Smith the incidents in which she had been involved; the lack of progress in her performance; his concerns regarding her reluctance to work with electricity and the danger that creates; and the complaints he had received from customers and employees regarding her work. (Doc. 26-1 at 39–40).

Amber Smith testified that the week preceding the Monday on which she was fired, she complained to Roy Smith that her paychecks were less than the amount that her time sheets indicated she was due. (Doc. 26-2 at 139–40). She alleges that Roy Smith told her during that meeting that he would find out and let her know something. (*Id.* at 140). The next thing she heard from Roy Smith was that she was being terminated.

## II.    STANDARD OF REVIEW

When a district court reviews a motion for summary judgment, it must determine two things: whether any genuine issues of material fact exist, and, if none, whether the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

The court must "view the evidence presented through the prism of the substantive evidentiary burden" to determine whether the non-moving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must not weigh the evidence and make credibility determinations because these decisions belong to a jury. *See id.* at 254.

Further, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). After both parties have addressed the motion for summary judgment, the court must grant the motion *only if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

## III.    DISCUSSION

Metro has moved for summary judgment on Amber Smith's claims for Title VII gender discrimination and FLSA retaliation, and partial summary judgment on her unpaid wages claims under the FLSA.

### A.    Title VII Gender Discrimination Claim

Metro argues, and Amber Smith concedes, that Amber Smith is unable to establish that Metro's proffered reason for terminating her employment is pretext for unlawful discrimination. (Doc. 28 at 11). Amber Smith also admits this concession precludes her from establishing a successful claim under the *McDonnell Douglas* framework. However, Amber Smith urges that her Title VII gender discrimination claims survive summary judgment under the "mixed motive" and "circumstantial mosaic" frameworks.

#### i.    The "mixed motive" theory

The Eleventh Circuit has established that, to survive summary judgment under a "mixed-

motive" framework, the plaintiff "need only produce evidence sufficient to convince a jury that (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1232 (11th Cir. 2016) (alteration in original) (quoting *White v. Baxter Healthcare Corp.*, 535 F.3d 381, 400 (6th Cir. 2008)). Because Amber Smith's termination clearly qualifies as an adverse employment action, the court will only focus on the second issue of whether Amber Smith's protected characteristic—her gender—was a motivating factor in Roy Smith's decision to fire her.

Where mixed-motive discrimination claims are established with circumstantial evidence, the evidence "suggests, but does not prove, a discriminatory motive." *Quigg*, 814 F.3d at 1235–36 (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)). "[T]he plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "When an employee raising a mixed-motive discrimination claim relies solely on remarks that indirectly evidence discrimination, the employee must show that circumstances surrounding the remarks create a genuine issue of material fact that the employer actually relied on her sex or gender in making its decision." *Quigg*, 814 F.3d at 1241 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)).

Here, Amber Smith has not produced any direct evidence that her gender was a motivating factor in Roy Smith's decision to terminate her employment with Metro. Rather, Amber Smith submits one piece of circumstantial evidence: that because Roy Smith cited "Ms. Hutto's complaint" as one of the reasons for terminating her, a reasonable jury could conclude that her gender was a motivating factor for that decision. (Docs. 28 at 10; 26-1 at 39).

Specifically, Amber Smith argues that "Roy Smith knew that Ms. Hutto's complaint was focused on Plaintiff's gender because Plaintiff told Roy Smith that the customer did not want her working on her house because [Amber Smith] was a woman. Plaintiff's disagreement with the customer's discriminatory treatment of her only angered Roy Smith and caused him to 'holler' at [Amber Smith]." (Doc. 28 at 13). Amber Smith further argues that "Roy Smith went along with" the customer's complaint "by taking [Amber Smith] off that job because she was a woman." (*Id.*)

Amber Smith's Response brief, therefore, paints the picture that Ms. Hutto did not want Amber Smith to service her HVAC unit because Amber Smith was a woman; Amber Smith communicated that fact to Roy Smith, who then became angry because Amber Smith disagreed with the customer's discriminatory treatment of her; Roy Smith pulled her off that particular job because she was a woman; and because Roy Smith cited that incident as one of the reasons for Amber Smith's termination, a reasonable juror could conclude that Amber Smith's gender was at least one motivating factor in her termination. Were the record consistent with that picture, the court might be persuaded to adopt Amber Smith's argument. However, a closer look at Roy Smith's and Amber Smith's depositions reveals a less convincing story.

Amber Smith testified that Roy Smith told her "the customers are always right"; she was "not supposed to let the customers know when something is wrong or something like that"; and that she understood Roy Smith's frustration to be directed toward her mentioning "something to the customer about putting the plywood" in the attic. (Doc. 26-2 at 15–16). This testimony does not support the assertion in her brief that Roy Smith became angry with her because she disagreed with the customer's sexist comments. Rather, it quite clearly shows that Amber Smith understood Roy Smith's frustration with her was regarding the way she handled her need to place the plywood in Ms. Hutto's attic.

Amber Smith also asserts that a jury could reasonably find that gender motivated Roy Smith's termination of Amber Smith because Roy Smith adopted Ms. Hutto's allegedly sexist remarks by pulling her off the job at her home. The record does not support this argument either. Amber Smith testified that *Ms. Hutto*—not Roy Smith—prevented her reentry into the home. Therefore, even assuming Amber Smith did relay Ms. Hutto's remarks to Roy Smith, it would be unreasonable to conclude that he adopted Ms. Hutto's position simply because he did not override the homeowner's wishes and send Amber Smith into her home.

Roy Smith also testified that Ms. Hutto would not allow *any* Metro service technician to service her attic unit after the incident with Amber Smith. Therefore, no evidence before the court suggests that Roy Smith discontinued Amber Smith's service call to Ms. Hutto's home for any reason other than to comply with Ms. Hutto's wishes. Based on the record, Roy Smith had no other appropriate alternative.

Amber Smith also asserts that Roy Smith's comments to her when he terminated her employment create a genuine dispute of fact regarding whether he considered her gender in making that decision. Amber Smith alleges in her Response brief that Roy Smith cited Ms. Hutto's complaint that she did not want a woman working in her house among the reasons for terminating her. However, the record contains no evidence that Roy Smith cited Amber Smith's incident with Ms. Hutto for that particular purpose.

When asked what reasons he gave Amber Smith for her termination, Roy Smith testified that he mentioned that her customers and colleagues had complained to him about her performance. When asked in his deposition who had complained about Amber Smith, Roy Smith named Ms. Hutto. (Doc. 26-1 at 39). Although Plaintiff's counsel did not ask Roy Smith to explain the details of Ms. Hutto's complaint, Plaintiff's counsel had previously asked Roy Smith

what he remembered about Ms. Hutto's phone call to him while Amber Smith was still at her home on the service call. (Doc. 26-1 at 31). Roy Smith testified that Ms. Hutto was "very concerned about Amber Smith being at her residence," and that she "was afraid Amber Smith was going to damage her home or get injured" by "attempting to bring various pieces of plywood into the home to take up to the attic." (*Id.*). Amber Smith offers no further evidence regarding Ms. Hutto's complaint or anything disputing Roy Smith's account of the events.

As explained above, Amber Smith has not submitted sufficient evidence for a jury to reasonably find that Roy Smith adopted Ms. Hutto's sexist remarks. Nor does the record contain facts tending to show that Roy Smith's reference to Ms. Hutto's complaint had anything to do with Amber Smith's gender. Amber Smith simply has not produced any probative evidence that disputes Roy Smith's contention that "he had to let [her] go" because "he was worried about [her] safety and . . . just felt that [she] didn't know what [she] was doing." (Docs. 28 at 9; 26-2 at 18).

Therefore, viewing the evidence in the light most favorable to Amber Smith, the court finds that a jury could not reasonably conclude that gender was a motivating factor in Amber Smith's termination. Aside from Ms. Hutto's alleged comments—which there is no reasonable sign that Roy Smith adopted—Amber Smith has not provided any evidence of discriminatory conduct. Roy Smith hired Amber Smith knowing she was female, and all the evidence suggests that he fired her based on safety concerns and her on-the-job performance, without any regard to her gender. Therefore, Amber Smith's Title VII discrimination claim does not survive summary judgment under the mixed-motive framework.

### ii. The "circumstantial mosaic" theory

Amber Smith also argues that her discrimination claim survives summary judgment

under the "circumstantial mosaic" framework laid out in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011). There, the Eleventh Circuit provided that "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* at 1328 (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)). For summary judgment to be improper, the circumstantial evidence, when taken in the light most favorable to the plaintiff, must be "convincing" and must raise "a reasonable inference that the employer discriminated against the plaintiff." *Id.*

Amber Smith relies on the same evidence provided in her mixed-motive argument to urge a reasonable inference that Roy Smith discriminated against her because of her gender. As stated above, even when construed in the light most favorable to Amber Smith, the record simply does not support such an argument. Therefore, for the same reasons the court found a lack of circumstantial evidence to satisfy the mixed-motive framework, the court also finds a lack of circumstantial evidence to satisfy the "convincing mosaic" framework. In short, her mosaic is not convincing. The court will grant summary judgment for Metro on Amber Smith's Title VII gender discrimination claim.

**B.     FLSA Retaliation Claim**

Amber Smith alleges that Metro terminated her employment because she complained that Metro was failing to pay her overtime for the hours she worked in excess of 40 hours a week. Though the record lacks clarity on the exact timing of events, viewing the allegations in the light most favorable to Amber Smith, Roy Smith fired her within a week of her inquiry regarding her unpaid overtime. Because such an inquiry is protected activity under the Fair Labor Standards Act, Amber Smith claims that the temporal proximity between her complaint and her discharge

alone shows that she would not have been fired but for her complaint.

To establish a prima facie case of FLSA retaliation, Amber Smith must show that "(1) she engaged in activity protected under the act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000). Under the third element regarding causation, Amber Smith "must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights." *Id.* at 1343 (quoting *Reich v. Davis*, 50 F.3d 962, 965–66 (11th Cir. 1995)).

Amber Smith asserts that she can establish a triable issue of fact regarding her retaliation claim based on temporal proximity alone because Roy Smith terminated her employment "nearly immediately" after she asked him about her unpaid overtime. (Doc. 28 at 16). She relies on *Thomas v. Cooper Lighting, Inc.*, in which the Eleventh Circuit held that to satisfy the causation requirement for a prima facie retaliation claim, "mere temporal proximity, without more, must be very close." 506. F.3d 1361, 1363 (11th Cir. 2007). So, Amber Smith argues, the temporal proximity between her complaint to Roy Smith and her termination were "very close," and is therefore sufficient to satisfy the "but-for" causation requirement. *See also Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x. 820, 823 (11th Cir. 2008) (a plaintiff can show she would not have been fired but for her assertion of FLSA rights by proving a "'close temporal proximity' between the time her employer learned about her protected activity and her discharge"); *Prosser v. Thiele Kaloin Co.*, 135 F. Supp. 3d 1342 (M.D. Ga. 2015) ("very close" temporal proximity between protected activity and adverse action sufficient to satisfy but-for causation at summary judgment stage).

Defendants, on the other hand, argue that this court has determined that temporal

proximity alone is insufficient to satisfy the but-for causation requirement, and even if the court chooses not to follow its own precedent, Amber Smith's argument still fails because she has not established pretext. The court will now address both of these arguments.

First, Metro argues that recent developments in case law surrounding retaliation claims establish that temporal proximity alone is no longer sufficient to satisfy the causation requirement. To support this argument, Defendants cite Judge Acker's opinion in *Montgomery v. Board of Trustees of the University of Alabama*, holding that "[m]erely showing that [the plaintiff] was terminated shortly after she complained does not meet the prima facie standard for proof" of causation in a Title VII retaliation claim. No. 2:12-cv-2148-WMA, 2015 WL 1893471, at *4 (N.D. Ala. Apr. 27, 2015).

Judge Acker concluded that, while close temporal proximity alone had been sufficient to satisfy the mere "motivating factor" causation standard in Eleventh Circuit Title VII retaliation cases in the past, the Supreme Court's opinion in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013) undermined that precedent by establishing that plaintiffs must indeed prove "but-for" causation to establish a prima facie retaliation claim. *Id.* at *1. Judge Acker commented: "Under the pre-*Nassar* 'motivating-factor' framework in retaliation cases, the Eleventh Circuit had construed the 'causal link element broadly so that a plaintiff merely ha[d] to prove that the protected activity and the adverse action [we]re not completely unrelated.'" *Id.* at *2 (quoting *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)). However, he reasoned that *Nassar*'s more rigorous "but-for" causation requirement meant that plaintiffs could no longer "demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity" alone. *Id.* at *4.

While Judge Acker's conclusion may or may not be an appropriate application of the

"but-for" causation requirement in *Title VII* retaliation cases, this court finds no reason that the Supreme Court's holding in *Nassar* affected Eleventh Circuit precedent regarding the sufficiency of temporal proximity in *FLSA* retaliation cases. The reason is that the Eleventh Circuit had been requiring but-for causation in FLSA retaliation cases long before *Nassar. See, e.g, Wolf*, 200 F.3d at 1343; *Davis*, 50 F.3d at 965–66. Therefore, Judge Acker's conclusion that *Nassar* requires more than temporal proximity in Title VII cases has no apparent bearing on the FLSA claim presently before this court, especially given that this court is not required to follow district court precedent. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). Further, because ample Eleventh Circuit case law exists on this matter, the court opts, rather, to lean upon that body of law.

In *Wolf v. Coca-Cola Co.*, the Eleventh Circuit stated that to satisfy the causation element of a prima facie FLSA retaliation claim, the plaintiff "must show she would not have been fired but for her assertion of FLSA rights." 200 F.3d 1337, 1343 (11th Cir. 2000). Then, the Court explained that the appellant in that case had not produced sufficient information to survive summary judgment because her "only evidence of pretext [was] insufficient" to establish but-for causation. *Id.* In other words, part of establishing "but-for" causation is also satisfying the pretext requirement—which brings us to Metro's second argument.

The quotations above from the Court's decision in *Wolf* clearly reveal that a plaintiff relying on temporal proximity to establish the causation requirement must also overcome a defendant's legitimate, nondiscriminatory reason for the adverse action. Thus, the plaintiff must first establish a prima facie case, then establish pretext. Therefore, even if this court determined that Amber Smith's termination occurred in "very close" temporal proximity to her complaint, she would still be required to show that Metro's alleged reasons for her termination were pretext

for discrimination. This case is not the first occasion in which the undersigned has taken this position.

In *Foy v. Pat Donalson Agency*, this court stated: "If the plaintiff meets her *prima facie* case, then the employer, in turn, must assert a legitimate reason for the adverse action, and the plaintiff may thereafter attempt to show pretext." 946 F. Supp. 2d 1250, 1274 (N.D. Ala. 2013) (citing *Wolf*, 200 F.3d at 1342–43). *Accord Everett v. Grady Memorial Hosp. Corp.*, 703 F. App'x. 938, 950 (11th Cir. 2017) (plaintiff must show "but-for" causation, and because defendants proffered legitimate reasons for adverse actions, Plaintiff must also show the proffered reasons were pretextual); *Raspanti v. Four Amigos Travel, Inc.*, 266 Fed. App'x. 820, 823 (11th Cir. 2008) ("Even if [Plaintiff] had established [causation], she failed to prove that the reasons for her dismissal were pretextual").

As previously noted, Amber Smith concedes that she is unable to establish that Metro's reasons for terminating her employment were pretextual. (Doc. 28 at 11). Therefore, even if the court found that temporal proximity alone is sufficient for establishing but-for causation, and even if the court found that her protected complaint to Roy Smith occurred sufficiently close to her termination so as to actually establish but-for causation, Amber Smith's inability to satisfy *Wolf*'s requirement that she also establish pretext prevents her FLSA retaliation claim from moving forward. Therefore, the Defendants are due summary judgment as to that claim.

## C.    FLSA Unpaid Overtime Claims

Amber Smith alleges in her complaint that she regularly worked more than 40 hours per week, "[d]uring her entire employment" Metro did not compensate her for "all of her hours worked," and Metro did not compensate her "for overtime hours at a rate of one and one-half times the normal pay rate." (Doc. 1 at 6). Plaintiff concedes that Metro was not required to

compensate her for time spent traveling to job sites from her home, or from job sites back to her home at the end of her workday. She argues, rather, that Metro's Office Manager, Michelle Wynn, would consistently go through her time sheets each week, and the number of hours "Ms. Wynn deemed to be compensable would generally add up to fewer than the total hours Plaintiff reported working." (Doc. 28 at 19). Amber Smith asserts that Ms. Wynn provided no explanation as to why certain hours were deemed non-compensable, and those reductions prevented Amber Smith from receiving the overtime pay that she deserved.

Metro concedes in its motion for summary judgment that there are genuine issues of material fact regarding whether Amber Smith is entitled to unpaid wages for lunch breaks because the parties dispute whether she was working during those breaks. Amber Smith concedes that Metro is not required to compensate her for time driving between job sites and her home at the beginning and end of each day. Therefore, the court will treat Amber Smith's unpaid overtime claims regarding travel time between her home and work as abandoned, but not her claims for unpaid wages for lunch breaks.

Moving past these concessions, the court must decide whether summary judgment is appropriate on Amber Smith's claim that Metro did not compensate her for what Metro considered to be non-compensable "down time" during the middle of her workday. Amber Smith argues "she was consistently paid for fewer hours than she reported working during the middle of each day" and "disputed issues of fact remain as to whether Amber Smith was in fact waiting to be engaged" (which would not be compensable time), or "was working during the periods of time when Ms. Wynn unilaterally determined that she should not be paid." (Doc. 28 at 19). Amber Smith testified in her deposition that there were "a few times" when Metro told her to "hang around where [she] was until they could figure something out, find something for [her] to

do." (Doc. 26-2). When asked about the discrepancies between Amber Smith's alleged compensable work hours and those for which she was actually compensated, Roy Smith testified that the likely explanation for the discrepancy is that Ms. Wynn consulted the GPS device on Amber Smith's work vehicle and concluded that Amber Smith's timekeeping was inaccurate. (Doc. 26-1 at 25–26).

A genuine dispute of material fact exists regarding whether Metro appropriately labeled Amber Smith's time during the middle of each day she worked as noncompensable down time. While Defendants walked Amber Smith through each of her time sheets during her deposition, and submitted those same time sheets as evidentiary exhibits, the court is unsure of just exactly what the court was supposed to glean from that information. Defendants assert that Amber Smith "identified all hours for which she claims she was not compensated" in her deposition, and that time totaled "less than twenty hours of allegedly unpaid time." (Doc. 29 at 10). However, Defendants did not argue or provide any evidence that Metro's failure to pay those disputed hours did not affect Amber Smith's FLSA rights.

Given the requirement that the court must view all evidence in the light most favorable to Amber Smith, the simple fact of the matter is that Amber Smith alleges that Metro improperly cut or refused to pay her for hours that she contends she worked, and in doing so, denied her overtime pay in violation of the FLSA. Because the record is not so clear as to establish that Metro never improperly reduced Amber Smith's work hours in violation of the FLSA, Metro has not produced sufficient evidence to overcome that dispute of fact. Therefore, Amber Smith's FLSA overtime pay claims will move forward (but only her claims regarding unpaid lunch breaks and down time during the middle of the day. As mentioned above, Amber Smith abandoned those overtime pay claims associated with travel to and from her home in her

Response brief. (Doc. 28 at 19).)

IV.    **CONCLUSION**

For the reasons explained above, the court will enter summary judgment in favor of Metro on Amber Smith's Title VII gender discrimination claim and her FLSA retaliation claim. The court will enter partial summary judgment as to Amber Smith's unpaid overtime claims regarding any time she spent traveling to work from her home and from her home to her work. The case will move forward with Amber Smith's FLSA revised unpaid overtime claims regarding the time she alleges Metro wrongfully deducted from her time sheets.

**DONE** this the 27th day of February, 2018.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE